TONY WEST (CA Bar #164151)
Assistant Attorney General
DAVID B. BARLOW (Bar #13117)
United States Attorney
DANIEL D. PRICE (Bar #2646)
Assistant United States Attorney
ARTHUR R. GOLDBERG (DC Bar #180661)*
Assistant Director, Federal Programs Branch
JOSHUA WILKENFELD (NY Bar #4440681)*
VARU CHILAKAMARRI (NY Bar #4324299)*
Department of Justice
Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, DC 20001
Telephone:     (202) 305-7920
Facsimile:     (202) 616-8470
Email:         joshua.i.wilkenfeld@usdoj.gov

Attorneys for the United States.

*Applications for admission *pro hac vice* forthcoming

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| The United States of America,<br><br>Plaintiff,<br><br>v.<br><br>The State of Utah; and Gary R. Herbert, Governor of the State of Utah, in his official capacity,<br><br>Defendants. | Case No.  2:11-CV-01072 SA<br><br>**COMPLAINT**<br><br>Honorable Samuel Alba |

Plaintiff, the United States of America, by its undersigned attorneys, brings this civil action for declaratory and injunctive relief, and alleges as follows:

## INTRODUCTION

1.      In this action, the United States seeks to declare invalid and enjoin the enforcement of Sections 3, 10, and 11 of H.B. 497, and Utah Code Ann. § 76-10-2901 (as amended), because these provisions are preempted by federal law and therefore violate the Supremacy Clause of the United States Constitution.

2.      In our constitutional system, the federal government has preeminent authority to regulate immigration matters.  This authority derives from the United States Constitution and numerous acts of Congress.  The nation's immigration laws reflect a careful and considered balance of national law enforcement, foreign relations, and humanitarian interests.  To best effectuate and balance these different interests, the Constitution entrusts the federal government with the exclusive authority to determine both "the character of [immigration] regulations" and "the manner of their execution." *Chy Lung v. Freeman*, 92 U.S. 275, 280 (1876).

3.      Congress has assigned to the United States Department of Homeland Security, Department of Justice, and Department of State, along with other federal agencies, the task of enforcing and administering these immigration-related laws.  In administering these laws, the federal agencies balance the complex – and often competing – objectives that animate federal immigration law and policy.  Although states may exercise their police power in a manner that has an incidental or indirect effect on

2

aliens, a state may *not* establish its own immigration policy or enforce state laws in a manner that interferes with the federal immigration laws.  A state such as Utah that purports to systematically assist the federal government in the enforcement of federal immigrations laws may do so only in cooperation with the federal government.  The Constitution and the federal immigration laws do not permit the development of a patchwork of state and local immigration policies throughout the country.

4.      Despite the preeminent federal authority and responsibility over immigration, the State of Utah recently enacted H.B. 116, H.B. 466, H.B. 469 and H.B. 497 (collectively, "Utah Immigration Statutes"), immigration-related provisions that were designed to be "combined" so as to "constitute . . . the Utah solution" for immigration reform.  *See* Press Release, Governor Herbert Signs Immigration Reform Legislation (Mar. 15, 2011).  In pursuing a "Utah solution" through the Utah Immigration Statutes, the State of Utah has explicitly disregarded Congress's policies and objectives in favor of its own.

5.      Utah's adoption of its own immigration policy disrupts the federal government's ability both to administer and enforce the federal immigration laws including as set forth in the Immigration and Nationality Act ("INA"), and to establish and pursue federal policies and priorities pertaining to, *inter alia*, the identification, apprehension, detention and removal of aliens unlawfully in the United States.  By contributing to this state-specific immigration policy, the challenged provisions of H.B. 497 represent an attempt to regulate in an area constitutionally reserved to the federal

3

government, forcing a conflict with the federal immigration laws and federal immigration policy, interfering with federal primacy in managing the nation's foreign affairs and in balancing the competing objectives of immigration policy, and impeding the accomplishment and execution of the full purposes and objectives of Congress. Sections 3, 10, and 11 of H.B. 497 are therefore preempted.

6.      Through its verification and warrantless arrest provisions, H.B. 497 sets its own enforcement priorities, rendering Utah state and local police unable to respond to federal direction and guidance in this area. Undoubtedly, state and local law enforcement agencies are invaluable partners in the enforcement of federal immigration law. But here, Utah has chosen to enforce federal immigration law in a way that interferes with the state's ability to be responsive to the policies and priorities of the federal government. The INA, reflecting federal primacy in immigration enforcement, precludes that choice.

7.      Utah's systematic state enforcement of federal immigration law may only be undertaken in cooperation with the Secretary of Homeland Security and the Attorney General – meaning that Utah must remain in a position to be fully responsive to the direction and guidance of the federal government and to federal priorities. But here, H.B. 497 precludes state and local officers in Utah from being able to respond to federal priorities.

8.      H.B. 497, if implemented, will therefore disrupt the enforcement of federal immigration law. The statute will additionally cause the detention and harassment of authorized visitors, immigrants, and U.S. citizens, thereby further undermining exclusive

federal control over the conditions of residence for lawfully admitted aliens and, potentially, a wide range of U.S. foreign affairs interests and commitments.

9.      Utah is not the only state that has attempted to encroach upon the federal government's exclusive authority to regulate immigration.  When considered in the aggregate, the various conflicting state immigration enforcement schemes would result in further and significant damage to the United States' ability to fairly and consistently enforce and administer the federal immigration laws and to exercise the discretion vested in the executive branch under federal law.  Some state laws seek to evade federal enforcement while others seek to force the federal government to increase enforcement efforts in certain state-selected areas.  And some state laws have explicitly attempted to impact the removal process by so pervasively affecting the conditions of an alien's residence in the United States as to force the alien to self-deport.  This patchwork of inherently contradictory immigration regimes would result in the divergent treatment of aliens across the United States and interfere with the United States' ability to speak with one voice in this highly sensitive area.

10.      The United States has undertaken significant efforts to secure our nation's borders and to provide a robust, functional admission and removal process.  The federal government, moreover, welcomes cooperative efforts by states and localities to aid in the enforcement of the nation's immigration laws.  But the United States Constitution forbids Utah from supplanting the federal government's immigration regime with its own state-specific immigration policy – especially where that policy, in purpose and effect,

5

interferes with the numerous interests the federal government must balance when enforcing and administering the immigration laws.  Accordingly, Sections 3, 10, and 11 of H.B. 497 are invalid under the Supremacy Clause of the United States Constitution and must be enjoined and declared unconstitutional.

## JURISDICTION AND VENUE

11.    This action arises under the Constitution of the United States, Article VI, Clause 2 and Article I, Section 8, and the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101, *et seq.*  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1345, and the United States seeks remedies under 28 U.S.C. §§ 1651, 2201, and 2202.

12.    Venue lies in the District of Utah pursuant to 28 U.S.C. § 1391(b). Defendants are the Governor of Utah, who resides in Utah, and the State of Utah.  A substantial part of the events or omissions giving rise to this claim occurred in Utah.

## PARTIES

13.    The United States of America is the plaintiff in this action, suing on its own behalf, as well as on behalf of the United States Department of Homeland Security ("DHS"), the Department of Justice ("DOJ"), and the Department of State.

14.    DHS is an executive department of the United States.  *See* 5 U.S.C. § 101; Homeland Security Act, Pub. L. No. 107-296, 116 Stat. 2135 (2002).  DHS is responsible for the administration and enforcement of laws relating to immigration, as well as the investigation of immigration crimes and protection of the United States border

against the illegal entry of aliens. *See* 8 U.S.C. § 1103. As part of this responsibility, DHS has been charged by Congress with setting priorities for the identification and removal of certain classes of aliens. DHS Appropriations Act, 2010, Pub. L. No.111-83, Title II, 123 Stat. 2142, 2149 (2009). DHS is also responsible for providing citizenship and immigration services through U.S. Citizenship and Immigration Services, as well as providing certain aliens with authorization to work in the United States.

15.      DOJ is an executive department of the United States. *See* Act to Establish the Department of Justice, ch. 150, 16 Stat. 162 (1870). The Attorney General, as the head of DOJ, shares certain immigration-related responsibilities with the Secretary of Homeland Security, and he may, among his various immigration functions, order aliens removed from the United States and order the cancellation of any alien's removal. *See, e.g.*, 8 U.S.C. §§ 1103, 1158, 1182, 1227, 1229a, 1229b.

16.      The Department of State is an executive department of the United States. *See* State Department Basic Authorities Act of 1956, Pub. L. No. 84-885, as amended; 22 U.S.C. § 2651 *et seq*. The Department of State is partially responsible for administering aspects of the federal immigration laws, including but not limited to the administration of visas.

17.      Defendant, the State of Utah, is a state of the United States that entered the Union as the 45th State in 1896.

18.      Defendant, Gary R. Herbert, is the Governor of Utah, and is being sued in his official capacity.

7

## STATEMENT OF THE CLAIM

### Federal Authority and Law Governing Immigration and Status of Aliens

19.     The Supremacy Clause of the Constitution mandates that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const., art. VI, cl. 2.

20.     The Constitution affords the federal government the power to "establish an uniform Rule of Naturalization," U.S. Const., art. I § 8, cl. 4, and to "regulate Commerce with foreign Nations," U.S. Const., art. I § 8, cl. 3.  Further, the federal government has broad authority to establish the terms and conditions for entry and continued presence in the United States, and to regulate the status of aliens within the boundaries of the United States.

21.     The Constitution requires the President of the United States to "take Care that the Laws be faithfully executed."  U.S. Const., art. II § 3.  Further, the President has broad authority over foreign affairs.  Immigration law, policy, and enforcement priorities are affected by and have an impact on U.S. foreign policy, and are themselves the subject of diplomatic arrangements.

22.     For these various reasons, the Supreme Court has held that the Constitution grants the federal government exclusive responsibility over the "determination of who should or should not be admitted into the country, and the conditions under which a legal entrant may remain."  *De Canas v. Bica*, 424 U.S. 351, 355 (1976).

23.     Congress has exercised its authority to make laws governing immigration and the status of aliens within the United States by enacting the various provisions of the INA and other laws regulating immigration.  Through the INA, Congress set forth the framework by which the federal government determines which aliens may be eligible to enter and reside in the United States, which aliens may be removed from the United States, the consequences for unlawful presence, the penalties on persons who violate the procedures established for entry, other conditions of residence, and the process by which certain aliens may ultimately become naturalized citizens of the United States.  *See* 8 U.S.C. § 1101, *et seq.*

### Federal Law on Transporting and Harboring Aliens

24.     Just as the INA vests exclusive authority in the federal government to regulate alien entry, the INA and the Constitution also leave no room for state regulation on other issues connected to the process of alien entry or admission and the conditions under which an alien is permitted to remain.  The transportation and harboring of aliens is one such example of an area that, because of its close connection with the admission or entry of aliens, is exclusively subject to regulation by the federal government.

25.     In a partial exercise of its exclusive authority over the entry and movement of aliens, Congress has criminalized the facilitation of unlawful immigration.  In the INA, Congress has provided a detailed set of sanctions for those who unlawfully enter, 8 U.S.C. § 1325, and for any third parties who aid in their entry and stay, *see* 8 U.S.C. § 1323 (penalizing persons for unlawfully bringing aliens into the United States); 8 U.S.C.

§ 1324 (penalizing persons for bringing in or harboring certain aliens); 8 U.S.C. § 1327 (penalizing persons who assist certain inadmissible aliens to enter the country); 8 U.S.C. § 1328 (penalizing the importation of aliens for immoral purposes).   Specifically, federal law prohibits the knowing attempt to bring an alien into the United States "at a place other than a designated port of entry or place other than as designated by the [Secretary of Homeland Security]," 8 U.S.C. § 1324(a)(1)(A)(i), and imposes criminal penalties on a person who, "knowing or in reckless disregard" of the fact that an alien has unlawfully entered or remained in the United States, attempts to "transport or move" the alien within the United States "in furtherance of such violation of law." 8 U.S.C. § 1324(a)(1)(A)(ii). Although targeted at the third party, these criminal sanctions constitute another regulation of alien entry and movement, in that they assign liability to a third party who assists an alien in evading federal government's admission and enforcement processes.

26.    Federal law also provides a specific and limited role for states in this area, by authorizing states to make arrests for violations of the federal prohibitions on unlawfully bringing in and harboring aliens.  8 U.S.C. § 1324(c).

**The INA Establishes a Procedure for the Identification, Apprehension, and Removal of Unlawfully Present Aliens, and Also Provides Opportunities for State Assistance**

27.    Enforcement of the federal immigration laws relating to alien identification, apprehension, detention, and removal involves a different set of federal laws and considerations from the alien admission processes.  Whereas states are wholly barred from involvement in alien admission, states do provide critical assistance in alien

identification, apprehension, detention, and removal efforts.  But the Constitution bars states from taking actions that stand as an obstacle to accomplishment of federal goals and objectives in enforcing the immigration laws.

28.     Federal primacy in immigration enforcement is necessitated by a variety of constitutional and statutory factors.  First, because immigration law is exclusively federal in character, "the responsibility for the character of those regulations, and for the manner of their execution, belongs solely to the national government."  *Chy Lung v. Freeman*, 92 U.S. 275, 280 (1876).

29.     Federal primacy is also necessitated by the tight interconnection between immigration enforcement and foreign relations.  The Supreme Court has recognized that the treatment of foreign nationals – whether by the federal government or by any individual state – will affect relations with other countries and thus the welfare of the nation as a whole.

30.     The INA also confirms the imperative of federal primacy in immigration enforcement by crafting immigration enforcement as "a field where flexibility and the adaptation of the congressional policy to infinitely variable conditions constitute the essence of the program," *U.S. ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950) (internal citations omitted).  This flexibility is crucial because of resource constraints, the foreign policy implications of immigration enforcement, the humanitarian considerations underlying the INA, and the various opportunities for exercising discretion conferred by the INA on the administering agencies, among other factors.  Because the approach of

11

federal immigration law to immigration enforcement demands the consideration of a large number of case-specific factors, federal enforcement decisions necessarily require individualized scrutiny by federal enforcement officials. *See* Memorandum from John Morton, Director, U.S. Immigration and Customs Enforcement, titled "Exercising Prosecutorial Discretion Consistent with the Civil Immigration Enforcement Priorities of the Agency for the Apprehension, Detention, and Removal of Aliens" (June 17, 2011), available at http://www.ice.gov/doclib/secure-communities/pdf/prosecutorial-discretion-memo.pdf.   In turn, federal primacy over immigration enforcement is necessary to guarantee that the federal government is able to apply these myriad factors both to individual enforcement decisions and overall enforcement policy.

31.    Alien identification efforts – like all other aspects of federal immigration enforcement – therefore must proceed in a manner that can be responsive to federal policies and priorities.  As the Supreme Court has recognized, federal direction over the systems for immigration status verification is necessary so as to prevent the alien population from being subjected to the type of state-specific systems of "repeated interception and interrogation by public officials" that have a tendency to undermine foreign relations. *Hines v. Davidowitz*, 312 U.S. 52, 66 (1941).

32.    As part of its authorization to enforce the federal immigration laws, the INA establishes various procedures by which DHS and DOJ can identify unlawfully present aliens and other aliens who may be removable for, *inter alia*, working without

proper federal authorization, committing certain serious crimes, or failing to maintain proper immigration status.

33.     For example, the federal registration scheme plays a role in monitoring the entry and movement of aliens within the United States.  *See* 8 U.S.C. §§ 1201, 1301-1306; *see also* 8 C.F.R. Part 264 (regulations regarding "Registration and Fingerprinting of Aliens in the United States").  This system collects information from certain aliens who remain in the United States for 30 days or more, and further requires aliens to report their change of address to DHS within ten days of such change.  *Id*.

34.     In most instances, an alien gains lawful status in the United States through admission at the time of lawful entry into the United States.  *See* 8 U.S.C. §§ 1101(a)(12)(A), 1225.  Immigration status is verified whenever an alien enters the country.  Federal immigration officers are further empowered to "to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States" or to arrest any alien seen attempting to illegally enter the United States.  8 U.S.C. § 1357(a).

35.     Alien verification also proceeds in conjunction with the federal employment authorization process.   Whenever an alien applies for employment authorization, the federal government verifies the alien's immigration status.  Immigration status may be verified in a variety of other situations, such as when aliens apply for public benefits at either the state or federal level, or when anyone (alien or

otherwise) applies for certain types of employment (such as employment with certain government agencies or contractors).

36.     Additionally, the federal government verifies the immigration status of many aliens who are booked into detention facilities for any length of time. Whenever a federal, state, or local detention facility where the Secure Communities program is activated submits an alien's fingerprints to the Federal Bureau of Investigation ("FBI"), the FBI automatically routes the alien's fingerprints to DHS so as to enable DHS to check that information against DHS immigration records. The results of this immigration records inquiry help determine whether an alien is lawfully present; information that in turn helps determine whether to subject an alien to immigration enforcement proceedings (in addition to whatever criminal proceedings may result from the original state-law arrest) and whether to pursue removal of an alien subject to a final order of removal.

37.     Thus, the federal government has established a multi-layered system for registering aliens, maintaining records of their residence and obtaining other germane information, and verifying their immigration status at selected opportunities during the time of their residency in or visitation to the United States.

38.     State and local law enforcement play a valuable role in assisting the federal government with immigration enforcement in general and with alien identification efforts in particular. Federal law specifies various enforcement actions the states may take to assist the federal government's enforcement efforts. *See, e.g.*, 8 U.S.C. § 1103(a)(10) (authorizing DHS to empower state or local law enforcement with immigration

14

enforcement authority when an "actual or imminent mass influx of aliens . . . presents urgent circumstances requiring an immediate Federal response"); 8 U.S.C. § 1252c (authorizing state and local law enforcement to arrest aliens who are unlawfully present in the United States and were previously removed after being convicted of a felony in the United States); 8 U.S.C. 1324(c) (granting certain state and local law enforcement officers the authority to make arrests for violations of federal anti-transporting and harboring laws).

39.     The INA also contemplates a role for states in the identification of unlawfully present aliens.   Various statutes invite the states to assist the federal government in facilitating the federal government's immigration enforcement objectives. In turn, DHS has established numerous systems by which states can assist in the identification of certain aliens, and has published guidance advising states on the types of state activities that constitute cooperation with federal immigration enforcement efforts. *See* DHS, Guidance on State and Local Governments' Assistance in Immigration Enforcement and Related Matters (Sept. 21, 2011), available at http://www.dhs.gov/xlibrary/assets/guidance-state-local-assistance-immigration-enforcement.pdf.

40.     As a more general matter, the INA recognizes two avenues for the "[p]erformance of immigration officer functions by State officers and employees."   8 U.S.C. § 1357(g).

41.     First, a state or locality may "enter into a written agreement with" the Secretary of Homeland Security ("Secretary") "pursuant to which an officer or employee of the State or subdivision, who is determined by the [Secretary] to be qualified to perform a function of an immigration officer in relation to the investigation, apprehension, or detention of aliens in the United States . . . may carry out such function at the expense of the State or political subdivision and to the extent consistent with State and local law."   8 U.S.C. § 1357(g)(1).   The conditions for any such agreement are detailed by the INA.   *See* 8 U.S.C. § 1357(g)(1)-(9).

42.     Second, even in the absence of an agreement, state and local law enforcement may "otherwise . . . cooperate with the [Secretary] in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States." 8 U.S.C. § 1357(g)(10)(B).   This provision, undoubtedly, recognizes the prospect of state assistance in alien identification efforts.   But, in keeping with the Constitution's expectation of federal primacy in this sensitive area, the plain terms of the INA require cooperation with the Secretary in these efforts.

43.     This specific textual reference to cooperation with the federal government in alien identification efforts confirms the need for cooperation – *i.e.*, acting in a manner that maintains the state's ability to conform to the policies and priorities of the federal government and to be responsive to federal direction and guidance.   A state, for example, may pursue systematic alien identification efforts only if it remains in a position to be responsive to the direction and guidance of DHS at all times.   A state does not act

cooperatively if it attempts to interfere with this federal discretion, if it attempts to deny the federal government the opportunity to exercise this discretion, if it precludes responsiveness to federal direction, or if a state's pursuit of its own, state-specific priorities interferes with the federal government's ability to provide guidance and direction on immigration enforcement.

44.     Put otherwise, the opportunity that federal law provides for participation by state and local officials in immigration enforcement does not allow states to enact their own immigration policies to rival the national immigration policy – whether on alien identification or any other aspect of the immigration enforcement process.     The formulation of immigration policy and balancing of immigration priorities is a matter constitutionally and statutorily reserved for the federal government.

**Federal Law on Arrest Authority**

45.     State efforts to arrest aliens for immigration offenses likewise implicate the need for cooperation.   Beyond the general direction provided by DHS enforcement priorities, DHS provides some specific direction when it seeks to apprehend certain aliens.   Also, the federal government may affirmatively release certain aliens from immigration custody or decide not to detain certain aliens in the first place, demonstrating that DHS *does not* immediately seek those aliens' continued apprehension or detention. For example, DHS issues criminal arrest warrants, which function as a request from DHS to apprehend the alien cited in the particular warrant.   By contrast, an order of removal, by itself, does not constitute direction from DHS to arrest an alien.   Nor has DHS

17

generally requested that states arrest aliens who have been charged with aggravated felonies in other states. An alien subject to an order of removal may have been affirmatively released by DHS or may be eligible for certain forms of relief in removal proceedings that will result in that alien's release from custody.

### Utah Immigration Statutes

46.     On March 15, 2011, Governor Herbert signed into law H.B. 116, H.B. 466, H.B. 469 and H.B. 497, a series of statutes that "combine[]" to "constitute . . . the Utah solution" for immigration reform. *See* Press Release, Governor Herbert Signs Immigration Reform Legislation (Mar. 15, 2011). The legislative histories of these statutes indicate that they were considered as a package.

47.     The legislative history of these statutes makes clear that the Utah Immigration Statutes were not meant to bolster cooperation with the federal government, but were instead designed to position Utah in a primary role in establishing immigration law and policy. For example, Representative Litvak suggested that Utah should "try to be a lead in this country on how to address" immigration. Debate on H.B. 116 Before the Senate, Day 39 (2011). Similarly, Representative Ivory claimed that the package of Utah immigration statutes was designed to "reclaim[] a right" over immigration control to counter the federal government's "usurp[ation]" of immigration policy, and described the Utah immigration statutes as an effort to "push back against the federal government and the tradition built up in the courts" regarding federal primacy in immigration enforcement. Debate on H.B. 469 Before the House, Day 38 (2011).

18

48.     This effort to wrest control over federal immigration law is manifest in the specific provisions of H.B. 497 that directly conflict with federal law.

### Illegal Immigration Enforcement Act (H.B. 497)

49.     Sections 3, 10, and 11 of H.B. 497 represent an attempt to wrest control from the federal government over immigration enforcement efforts, and thereby conflict with the INA by directing and supervising the identification, apprehension, and detention of unlawfully present aliens.

50.     A statute that is explicitly (per its own title) designed to regulate "illegal immigration enforcement," H.B. 497 presents a multi-layered scheme to unconstitutionally interfere with federal policy-making in immigration enforcement.

### Mandatory Verification Scheme (Section 3)

51.     First, the statute establishes a mandatory verification scheme that conflicts with the INA by systematically obstructing responsiveness to federal priorities, guidance, and direction.

52.     Under H.B. 497, Utah law enforcement officials are asked, during the course of every lawful stop, to look for identification that could establish a "presum[ption]" that "[a] person is . . . lawfully present in the United States.   Utah Code Ann. § 76-9-1004.   If a presumption of lawful presence is not established, the statutory scheme proceeds to the next stage of verification.

53.     This sweeping mandate attempts to systematically identify unlawfully present aliens without any effort to cooperate with the federal government as required by

19

federal law, or to remain responsive to federal guidance. Every stop, detention, or arrest is a potential opportunity for a Utah-directed immigration investigation. This type of unilateral immigration enforcement makes no effort to cooperate with the federal government and thus conflicts with federal law.

54. After the preliminary assessment of lawful presence, further inquiry under H.B. 497 is required if a stopped individual is "arrested for an alleged offense that is a class A misdemeanor or a felony," at which point an officer "shall request verification of the citizenship or the immigration status of the person [from the federal government] under 8 U.S.C. § 1373(c)." *Id.* § 76-9-1003(1)(a)(i). Verification is also required if a "person is arrested and booked for a class B or C misdemeanor." *Id.* § 76-9-1003(1)(a)(ii).

55. Verification of immigration status is further required wherever, during the course of a lawful stop, an "officer makes observations that give the officer reasonable suspicion that the operator or any of the passengers in the [stopped] vehicle are violating" Utah's criminal prohibitions on harboring or transporting unlawfully present aliens. *Id.* § 76-9-1003(2).

56. These various mandates constitute non-cooperation and therefore stand as an obstacle to the fulfillment of the goals and objectives of the INA. H.B. 497 demands that Utah law enforcement officers engage in immigration enforcement in all situations where (i) a person is arrested for a class A misdemeanor, (ii) a person is arrested and booked for a Class B or C misdemeanor, or (iii) any person happens to be in a vehicle

that gives rise to a suspicion of smuggling or the transportation of unlawfully present aliens.  In these situations, then, the statute forecloses the prospect of responsiveness to DHS direction and guidance – including the possible direction *not* to systematically engage in immigration enforcement in any of these situations or to refrain from particular enforcement actions on a case-by-case basis.  These sweeping mandates therefore represent non-cooperative state efforts to participate in the "identification . . . of aliens not lawfully present in the United States" (8 U.S.C. § 1357(g)(10)(B)), which are preempted because they stand as an obstacle to the objectives of federal law.

57.    Beyond rejecting the prospect of federal direction, H.B. 497 also rejects the federal government's stated immigration enforcement priorities by forcing DHS to conduct multiple verification inquiries based on a single arrest.  At present, an alien's immigration status is often verified when that alien is arrested and booked into a Utah jail.  By mandating that the arresting officer verify immigration status, H.B. 497 will frequently result in redundant immigration status inquiries when an alien is arrested for a felony or Class A misdemeanor and then subsequently booked or when an alien is booked in jail after a Utah police officer decides to verify immigration status as an exercise of discretion:  An alien's status will be verified as a result of the arrest (per H.B. 497) and then could be verified again upon booking (whether per H.B. 497, per federal verification based on fingerprint submissions, or both).  These redundant checks serve as an unnecessary burden on DHS resources and will divert federal attention away from exigent circumstances, including high priority aliens who may otherwise be released.

58.     H.B. 497's mandatory inspection scheme and attendant federal verification requirements will therefore impermissibly impair and burden the federal resources and activities of DHS.  H.B. 497's mandate for verification of alien status will necessarily result in a substantial increase in the number of verification requests being issued to DHS – some of which will be wholly redundant of requests already being issued to DHS and some of which will involve U.S. citizens – and will thereby place a burden on DHS resources.

59.     The burden resulting from H.B. 497 is magnified by the prospect of all fifty states enacting similar regimes.  Such a patchwork of immigration laws – of which H.B. 497 is now a part – broadly contributes to undermining DHS operations by imposing significant burdens on DHS resources.  These types of state-imposed burdens on federal resources constitute a violation of the Supremacy Clause.

60.     Section 3 of H.B. 497 thus conflicts with and otherwise stands as an obstacle to the full purposes and objectives of Congress, and its enforcement would further conflict with the enforcement prerogatives and priorities of the federal government.  Moreover, Section 3 does not promote any legitimate state interest.

**Warrantless Arrest Authority (Section 11)**

61.     Beyond its mandatory verification scheme, H.B. 497 further disregards federal guidance and direction by systematically allowing its officers to contradict and disregard federal apprehension and detention decisions.

62.     Among other provisions, Section 11 of H.B. 497 amends Utah's previously-existing warrantless arrest statute to allow for a warrantless arrest "when [a] peace officer has reasonable cause to believe that [a] person is an alien" who is "subject to a civil removal order issued by an immigration judge" or "who has been charged or convicted in another state with one or more aggravated felonies as defined by 8 U.S.C. § 1101(a)(43)."   Utah Code Ann. § 77-7-2(5) (a) & (c).   Neither of these bases for a warrantless arrest constitute affirmative direction from the federal government to arrest an alien; and, in fact, Section 11 allows Utah police to affirmatively *contradict* federal apprehension and detention decisions that have already been issued.

63.     Utah has chosen to participate systematically in the "apprehension [and] detention" of unlawfully present aliens.   Pursuant to 8 U.S.C. § 1357(g)(10), however, Utah is only authorized to engage in such efforts if it acts in cooperation with the federal government.   But rather than promoting cooperation, Section 11's grant of warrantless arrest authority undermines federal apprehension decisions.   Section 11 authorizes the warrantless arrest of an alien who is subject to an order of removal.   However, the fact that an alien may have been issued such an order does not necessarily mean that the alien is subject to arrest and detention.   DHS does not detain all aliens who are placed in removal proceedings or are otherwise ordered removed.   DHS may decide not to detain an alien for various reasons, including that the alien has been granted relief from removal, that removal is not immediately possible, that the alien is pursuing further legal proceedings, or that legal restrictions preclude continued detention.   Similarly, Section 11

authorizes the warrantless arrest of an alien who has been charged or convicted of an aggravated felony in another state.  But, again, not all such aliens would be subject to arrest and detention by federal immigration officials, and yet these aliens would be subject to arrest under Section 11.  Accordingly, Section 11 authorizes the arrest of aliens whom the federal government – per its superior authority in immigration enforcement – may have affirmatively decided should not or cannot be held in custody.  For that reason, Section 11 interferes with and undermines federal law, including the federal government's enforcement prerogatives, and will necessarily impose burdens on lawful aliens in a manner that conflicts with the purposes and practices of the federal immigration laws.  The statute therefore stands as an obstacle to the accomplishment and execution of the full purposes of federal law.

64.     Additionally, as a result of these same infirmities, Section 11 authorizes the harassment and repeated interception and interrogation of lawfully present aliens – aliens whom the federal government is not seeking to detain and arrest, but are subjected to repeated re-arrests by Utah officials as a result of H.B. 497 – and thereby relatedly risks the type of "international controversies" that the Supreme Court has held "may arise from real or imagined wrongs to another's subjects inflicted, or permitted, by a government." *Hines v. Davidowitz*, 312 U.S. 52, 64 (1941).  For that reason, Section 11 interferes with the federal government's enforcement prerogatives and control of foreign policy and will necessarily impose burdens on lawful aliens in a manner that conflicts with the purposes and practices of the federal immigration laws.

65.    Similarly, Section 11 requires local police to determine what out-of-state crimes constitute aggravated felonies – an extremely complex determination of federal law – and thereby will necessarily result in the harassment of lawfully present aliens.  *See Padilla v. Kentucky*, 130 S. Ct. 1473, 1488 (2010) (Alito, J., concurring).  Almost by definition, Section 11 is triggered by non-Utah crimes (with which Utah police are unlikely to be familiar), and will demand an instantaneous judgment on an issue of federal law – whether the given out-of-state crime constitutes an aggravated felony for immigration purposes.  These types of determinations are the subject of intense training for federal officers and lie squarely outside of the general expertise of Utah police.  Accordingly, Section 11 will necessarily result in erroneous conclusions on whether an alien may be subject to removal proceedings for commission of an aggravated felony, and therefore will result in the harassment of lawfully present aliens.

### Transportation or Harboring Aliens (Section 10)

66.    Section 10 of H.B. 497 amends a previous statute, Utah Code Ann. § 76-10-2901, which criminalizes certain conduct relating to the transportation and harboring of unlawfully present aliens.  This provision prohibits a third party from transporting an alien into or within the state for commercial advantage or private financial gain, in furtherance of, and in knowing or reckless disregard of, the alien's unlawful presence.  *Id.* § 76-10-2901(2)(a).  This statute also prohibits the knowing concealment, harboring, or sheltering of an alien for commercial advantage or private financial gain.  *Id.* § 76-10-2901(2)(b).

25

67.     H.B. 497 amends Section 76-10-2901 by further prohibiting anyone from "encourag[ing] or induc[ing] an alien to come to, enter, or reside in this state, knowing or in reckless disregard of the fact that the alien's coming to, entry, or residence is or will be in violation of law."  *Id.* § 76-10-2901(2)(c).   H.B. 497 also makes "conspiracy" to commit any of the prohibited offenses an independent criminal offense.  *Id.* § 76-10-2901(2)(d).  In addition, H.B. 116 excludes from section § 76-10-2901's definition of "alien," an unlawfully present alien who obtains a "guest worker" or "immediate family" permit    under    Utah's    new    Guest    Worker    Program.    *See id.* § 76-10-2901(2)(b) (cross-referencing Utah Code § 63G-12-102).    Similarly, Section 76-10-2901 has been amended to exclude sponsors or aliens participating in Utah's "Resident    Immigrant    Program"    created    by    H.B.    469,    so    that    such    individuals' participation in the program will "not constitute encouraging or inducing an alien to come to,   enter,   or   reside   in   this   state   in   violation   of   Subsection   (2)(c)."   *Id.* § 76-10-2901(2)(b)(6).

68.     State statutes purporting to regulate third parties who transport or harbor aliens – such as Utah Code Ann. § 76-10-2901 – are preempted by Congress's regulation of   this   issue.    Congress   has   exercised   its   exclusive   authority   in   this   area   by comprehensively regulating the transportation, harboring, and concealment of aliens.  *See* 8 U.S.C.  § 1324.   This scheme arises from the federal government's undisputedly exclusive control over the terms and conditions of entry and consequences for unlawful entry – an area of regulation which includes sanctions on third parties who aid in entry or

unlawful presence.   Because the federal scheme for regulating the transportation and harboring of aliens forms an integral part of Congress's scheme for regulating alien entry, a state may not supplement the federal scheme.   Section 76-10-2901 regulates in an area that is reserved to the federal government and has been comprehensively regulated by the federal government.   Additionally, the statute conflicts with federal law.   Whereas federal law allows states, in certain circumstances, to make arrests for smuggling, H.B. 497 claims for Utah the authority to both arrest *and prosecute* smugglers and thereby conflicts with federal law.   *See* 8 U.S.C. § 1324(c).   For all these various reasons, Section 10 of H.B. 497 is therefore preempted.

69.     Additionally, because the purpose of Section 76-10-2901 is to deter and prevent the movement of certain aliens into Utah, the law restricts interstate commerce. Enforcement and operation of this state law provision would therefore conflict and interfere with the federal government's management of interstate commerce, and would thereby violate Article I, Section 8 of the United States Constitution.

70.     By reason of the foregoing, defendants' actions have caused and will continue to cause substantial and irreparable harm to the United States for which plaintiff has no adequate remedy except by this action.

## FIRST CAUSE OF ACTION – VIOLATION OF THE SUPREMACY CLAUSE

71.     Plaintiff incorporates paragraphs 1 through 70 of the Complaint as if fully stated herein.

72.     Sections 3, 10, and 11 of H.B. 497 and Utah Code Ann. section 76-10-2901 (as amended by H.B. 497) represent an impermissible effort by Utah to establish its own immigration policy and to directly regulate the immigration status of aliens.  In particular, Sections 3, 10, and 11 of H.B. 497 and Utah Code Ann. section 76-10-2901 (as amended by H.B. 497) conflict with federal law, demand immigration enforcement without cooperation with the federal government, disregard federal policies, interfere with federal enforcement priorities and foreign affairs interests in areas committed to the discretion of plaintiff United States, and otherwise impede the accomplishment and execution of the full purposes and objectives of federal law.

73.     Sections 3, 10, and 11 of H.B. 497 and Utah Code Ann. section 76-10-2901 (as amended by H.B. 497) thus violate the Supremacy Clause, and are invalid.

**SECOND CAUSE OF ACTION – PREEMPTION UNDER FEDERAL LAW**

74.     Plaintiff incorporates paragraphs 1 through 74 of the Complaint as if fully stated herein.

75.     Sections 3, 10, and 11 of H.B. 497 and Utah Code Ann. section 76-10-2901 (as amended by H.B. 497) are preempted by federal law, including 8 U.S.C. § 1101, *et seq*.

**THIRD CAUSE OF ACTION – VIOLATION OF THE COMMERCE CLAUSE**

76.     Plaintiff incorporates paragraphs 1 through 75 of the Complaint as if fully stated herein.

77.     Utah Code Ann. section 76-10-2901 (as amended by H.B. 497) restricts the interstate movement of aliens in a manner that is prohibited by Article One, Section Eight of the Constitution.

78.     Section 76-10-2901 (as amended by H.B. 497) violates the Commerce Clause, and is therefore invalid.

## **PRAYER FOR RELIEF**

WHEREFORE, the United States respectfully requests the following relief:

1.  A declaratory judgment stating that Sections 3, 10, and 11 of H.B. 497 and Utah Code Ann. section 76-10-2901 (as amended by H.B. 497) are invalid, null, and void;

2.  A permanent injunction against the State of Utah, and its officers, agents, and employees, prohibiting the enforcement of Sections 3, 10, and 11 of H.B. 497 and Utah Code Ann. section 76-10-2901 (as amended by H.B. 497);

3.  A preliminary injunction against the State of Utah, and its officers, agents, and employees, prohibiting the enforcement of Sections 3, 10, and 11 of H.B. 497 and Utah Code Ann. section 76-10-2901 (as amended by H.B. 497);

4.  That this Court award the United States its costs in this action; and

5.  That this Court award any other relief it deems just and proper.


DATED: November 22, 2011                    Respectfully submitted,

                                            TONY WEST (CA Bar #164151)
                                            Assistant Attorney General

                                            DAVID B. BARLOW (Bar #13117)
                                            United States Attorney

                                             *s/ Daniel D. Price*
                                            DANIEL D. PRICE (Bar #2646)
                                            Assistant United States Attorney

                                            ARTHUR R. GOLDBERG (DC Bar #180661)
                                            Assistant Director, Federal Programs Branch

                                            JOSHUA WILKENFELD (NY Bar #4440681)
                                            VARU CHILAKAMARRI (NY Bar #4324299)
                                            United States Department of Justice, Civil Division
                                            Federal Programs Branch
                                            20 Massachusetts Avenue NW

Washington, DC 20530
(202) 305-7920
(202) 616-8470 (fax)
Joshua.I.Wilkenfeld@usdoj.gov

Attorneys for the United States